Arif H. MOSRIE, Appellant,

v.

William C. TRUSSELL, Appellee.

No. 82–1478.

District of Columbia Court of Appeals.

Submitted July 7, 1983.

Decided Oct. 5, 1983.

Axel Kleiboemer, Washington, D.C., was on the brief for appellant.

No appearance was entered for appellee.

Before NEWMAN, Chief Judge, and KERN, Associate Judge, and REILLY, Chief Judge, Retired.

KERN, Associate Judge:

This is an appeal from a libel and slander action tried to a jury for four days. At the close of plaintiff Arif H. Mosrie's case, the judge directed a verdict for defendant William C. Trussell. The plaintiff appeals. We affirm.

The facts are that in the Spring of 1979 Trussell, as a Deputy Chief of Police, was the commanding officer of the Criminal Investigation Division of the Metropolitan Police Department. Mosrie, a captain, commanded the Homicide Branch. Thus, Trussell was Mosrie's immediate supervisor.

In early May various members of the Homicide Branch compiled a list of complaints against Trussell. The list alleged that Trussell improperly interfered in various homicide investigations and attributed to him a racist remark. These complaints were reported in the Washington Post on May 6, 1979, and are the subject of another lawsuit. *Trussell v. The Washington Post Company, et al.,* Civ.Act. No. 5792–80. After the news article, the Chief of Police requested Trussell to submit a written reply to the complaints and empaneled a board (the Board) to investigate the allegations. The Friday before his scheduled Monday appearance before the Board, Trussell gave the Chief of Police a memorandum reflecting claims allegedly made by an anonymous phone caller that Mosrie used his government vehicle for private business purposes and conducted private business on police department time. Trussell asked for an

investigation of Mosrie by the Internal Affairs Division.

In both his oral and written presentation to the Board and the Chief, the defendant made various alleged defamatory statements about the plaintiff which are the subject of this suit. He stated that Mosrie was derelict in his duties as Commander of the Homicide Branch, and that he suspected him of criminal abuses. Specifically, he suspected Mosrie of manipulating his pay records, running his outside businesses on police time, using his police cruiser for personal business; and, that he was often absent from work, did not respond to investigations after normal working hours and was not adequately informed as to homicide investigations.

■ The cause of action is based on Trussell's oral and written statements to the Board and the Chief regarding Mosrie's alleged dereliction of duty and possible criminal abuses, and a memorandum to the Director of the Internal Affairs Division encouraging an expanded investigation of Mosrie and other members of the Homicide Branch. It is conceded by both parties that Trussell enjoys a qualified privilege as to each alleged defamation. The communications were made upon a subject matter "in which the party communicating has an interest or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty . . . ." *Smith v. District of Columbia*, 399 A.2d 213 (D.C.1979), quoting *May Department Stores Company v. Devercelli*, 314 A.2d 767 (D.C.1973). Specifically, communications concerning alleged misconduct of a police officer to his superior are entitled to a qualified privilege. *Sowder v. Nolan*, 125 A.2d 52 (D.C.1956). An additional basis for the qualified privilege is self defense. *Dickens v. International Brotherhood, etc.*, 84 U.S.App.D.C. 51, 171 F.2d 21 (1948).

■ The qualified privilege is a complete defense to libel, but the defense is lost by the showing of malice. *Altimont, Inc. v. Chatelain*, 374 A.2d 284 (D.C.1977); *Ford Motor Credit Company v. Holland*, 367 A.2d 1311 (D.C.1977); *Roland v. d'Arazien*, 222 U.S.App.D.C. 203, 685 F.2d 653 (1982). Additionally, while the existence of the privilege is a question of law for the court, whether it was abused by the defendant, is a question of fact for the jury. *Altimont v. Chatelain, supra; Roland v. d'Arazien, supra*. The burden of proof is on the plaintiff, appellant here. *Altimont v. Chatelain, supra; Potts v. Dies*, 77 U.S.App.D.C. 92, 132 F.2d 734 (1942), *cert. denied*, 319 U.S. 762, 63 S.Ct. 1316, 87 L.Ed. 1713 (1943).

■ In the context of a qualified privilege, the definitions of malice "in substance come down to the equivalent of bad faith." *Ford Motor Credit Company v. Holland, supra*, 367 A.2d at 1314, quoting *H.E. Crawford Co. v. Dun & Bradstreet, Inc.*, 241 F.2d 387, 395 (4th Cir.1957); *Altimont, Inc. v. Chatelain, supra*, 374 A.2d at 290. It is

> the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will. [*Dun & Bradstreet, Inc. v. Robinson*, 233 Ark. 168, 345 S.W.2d 34, 38 (1961).]

*Id.; Ford Motor Credit Company v. Holland, supra*. Put another way, a qualified privilege exists only if the publisher believes, with reasonable grounds, that his statement is true. *Altimont v. Chatelain, supra; Afro-American Publishing Co., Inc. v. Jaffe*, 125 U.S.App.D.C. 70, 77, 366 F.2d 649, 656 (1966).

■ It is important to note that the mere existence of ill will on the part of the publisher toward the subject of the publication does not defeat the publisher's privilege if the privilege is otherwise established by the occasion and a proper purpose. W. PROSSER, HANDBOOK OF THE LAW OF TORTS, 794 (4th ed. 1971); *see Altimont v. Chatelain, supra*. The court looks to the primary motive by which the defendant is apparently inspired; and, the fact that he feels resentment and indignation towards the plaintiff and enjoys defaming him will *not* forfeit the privilege so long as the primary

purpose is to further the interest which is entitled to protection. W. PROSSER, *supra* at 794–95; *see Altimont v. Chatelain, supra; Dickins v. International Brotherhood, etc., supra.* Significantly,

> if the language of the communication and the circumstances attending its publication by the defendant are as consistent with the non-existence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant.

*National Disabled Soldiers' League, Inc. v. Haan,* 55 App.D.C. 243, 248–49, 4 F.2d 436, 441–42 (1925). *Altimont v. Chatelain, supra; Dickins v. International Brotherhood, etc., supra.*

▉ Here, there is evidence that Trussell's communications were inspired by resentment and indignation at Mosrie and others in the Homicide Branch. He admits that he suspected Mosrie of being the instigator of the complaint against him and of being the source of the Washington Post article. Mosrie argues that the memorandum by Trussell based on the anonymous phone call and requesting an investigation of Mosrie is evidence of malice.[1] Trussell arguably showed resentment when he submitted the memo to the Chief of Police rather than the head of Internal Affairs as was the custom in the Department. On the other hand, the Chief was already involved in the dispute between some members of the Homicide Branch and Trussell. Any finding of malice would be based only on speculation, which is not sufficient to send the issue to the jury. *Fisher v. Washington Post Co.,* 212 A.2d 335 (D.C.1965).

▉ Trussell arguably made two reckless comments to the Board. First, he stated to the Board that one of his accusers had killed another man after the two had been "guzzling" in a tavern for a couple of hours. The evidence establishes that the reference was to Mosrie, who while a member of the force, had killed a man in self defense outside a bar. This statement was arguably made in reckless disregard for the truth because Trussell admits that he knew that the killing must have been justified because otherwise Mosrie would be in jail rather than a captain on the police force. However, Trussell never identified Mosrie, among his several accusers, to the Board as the person involved in the shooting, and the record does not show whether any of the listeners, *i.e.*, the Board members, understood Trussell to mean Mosrie. Plaintiff is not suing for damages based on this statement and, by failing to show that a listener understood the remark as a reference to him, he did not establish a cause of action. *See* W. PROSSER, *supra* at 749.

Also, this statement must be considered in context. In his deposition Trussell explained that:

> I did not identify your client [Mosrie] and the purpose was to get this Inquiry Board to get the records up of my accusers—Mosrie is listed as one of the accusers—and look very carefully into their background. [Record at 188.]

Trussell had served as an Inspector in charge of the Internal Affairs Division. As a result, he knew some of what was in the records of his accusers, and his statement may be viewed as a dramatic attempt on his part to inspire the Board to review these records. While it may be evidence of ill will it may also be only colorful verbiage uttered in self defense.

The second arguably reckless statement to the Board by Trussell was that "anything that went down after hours, I would respond back, he wouldn't even respond." (Record on Appeal, Plaintiff's exhibit No. 7 at 21.) Trussell admitted that "that's a bit of an exaggeration on my part." (Supp. Record at 187). This statement was part of his response to a member of the Board who had asked Trussell for his opinion as to the motivations behind the accusations that he had made a racist remark. He gave his

---

1. Mosrie initially claimed this as part of his cause of action but it was dismissed in the trial court on defendant's motion for summary judgment since the memo was written outside of the statute of limitations. Plaintiff does not appeal that holding.

opinion that this was the culmination of problems he was having with the Commander of the Homicide Unit. First, it is important to note that while it is certainly an exaggeration, there is a kernel of truth to the allegation. Trussell continued his response by repeating an incident in which Mosrie called Trussell at home one Friday night about an important homicide. Mosrie did not respond that weekend to the murder while Trussell did, and worked all weekend.

Second, Trussell clearly was on the defensive. He had been accused by a group in the Homicide Branch of being an incompetent and a racist. With respect to self defense and determining malice, the relevant factors are the character of the language of the publication, whether it was inspired by an earnest effort of defense and whether the speaker acted honestly. With these factors in mind, the ultimate question for the trial court is whether the speaker was inspired by personal hatred or whether he was acting in defense and upon information which was reasonable to rely upon. *Dickins v. International Brotherhood, etc., supra.* "The defendant had the right to repel the attack upon it and to retort upon its assailant if such retort was a necessary part of its defense or fairly arose out of the charges made against it. . . . Mere vehemence, even exaggerated statements . . . will not as a matter of law destroy the privilege or necessarily present a question of fact, though, of course, the language of a retort may be so intemperate or violent as to be of itself evidence of malice." *Annot.,* 41 A.L.R.3d 1083, 1099–1100, *citing Collier v. Postum Cereal Co.,* 150 App.Div. 169, 134 N.Y.S. 847 (1912). The trial court could have concluded Trussell's retort fairly arose out of the charges made against him; thus, his statement was an exaggeration, but was not so intemperate as to be malicious.

While Mosrie has shown evidence of ill will on the part of Trussell, he has not shown that the qualified privilege of Trussell was not otherwise established by the occasion and proper purpose. Trussell was privileged to explain to both the Board and the Chief his opinion as to the motivations behind the list of complaints against him, and to report any suspected criminal wrongdoing or dereliction of duty. Having reviewed the record with care, we find reasonable grounds to conclude that there was substance to Trussell's belief that Mosrie was not adequately performing on the job, and Trussell's suspicion that there were abuses by Mosrie of his command position.

Specifically, the record shows that in addition to serving as chief of the Homicide Branch, Mosrie ran a company training security personnel, lectured at the University of Maryland and elsewhere, and operated eight vending machines. Mosrie admitted that his daily routine was to spend a considerable amount of time away from his office, and in fact was not in his office at all 12 of the 43 working days in January and February of 1979. Trussell claimed that Mosrie might under these circumstances be using some of this time for his personal businesses, and in fact an investigation concluded that there was some evidence he may have worked at one of his businesses while on sick leave.

There was also some evidence that Mosrie improperly used the police cruiser assigned to him by reason of his rank and office. With regards to compensatory time, Mosrie had earned more than two times as many hours as that claimed by the captain with the next highest amount. This is grounds for suspicion, and Trussell was clearly privileged to request an investigation. Furthermore, Trussell testified that he felt Mosrie was not on top of his cases and not adequately responding to investigations after hours. As his superior, Trussell is privileged to express this opinion. Moreover, as discussed above, these accusations were made to the Board investigating allegations of incompetence and racism against Trussell and Trussell was responding in self defense.

Finally, it is most significant that Mosrie was in fact *demoted* after an investigation by the Board. The charges before the Board were in essence the same charges

made by Trussell. It is an inescapable conclusion from the Board's action in demoting Mosrie that the Board had found substance to the allegations by Trussell of Mosrie's inattention to his duties and over-involvement in his off-duty activities. In light of this, we conclude a finding of an abuse of the qualified privilege by Trussell would be unsupported by the record because the evidence established proper occasion and purpose for his publication concerning Mosrie. At most, the evidence is as consistent with the nonexistence of malice on the part of Trussell toward Mosrie as it is with the existence. *Altimont v. Chatelain, supra; Dickins v. International Brotherhood, etc., supra.* We therefore conclude that the direction of the verdict by the trial court in favor of defendant Trussell as a matter of law was proper.

*Affirmed.*