Eleanor CARTER, Appellant,

v.

John S. HAHN, Appellee.

No. 02–CV–226.

District of Columbia Court of Appeals.

Submitted March 20, 2003.

Decided April 17, 2003.

Robert W. Rifkin, Washington, DC, for appellant.

Nathaniel Sims, Washington, DC, for appellee.

Before SCHWELB, RUIZ, and REID, Associate Judges.

REID, Associate Judge:

Appellant, Ms. Eleanor Carter, sued Mr. John S. Hahn and others for intentional infliction of emotional distress and defamation related to her arrest on theft charges.[1] On appeal she challenges the trial court's decision to grant his motion for directed verdict and to dismiss her claims. We reverse and remand for a new trial.

## FACTUAL SUMMARY

In late May 1999, Ms. Carter relocated and completed the necessary forms with her employer (DCHA) to have her paycheck mailed to her new home address. But the check was mistakenly sent to her old address and she never received it. So the DCHA issued her a replacement check. It also placed a stop payment order on her original check. In the meantime, someone retrieved the original check and endorsed it in Ms. Carter's name. That person presented the check for payment to the Market Liquor Store at 1400 7th Street, Northwest, which offers a check-cashing service.[2] Mr. Hahn, the store's operator, paid the check but was

---

1. Her complaint also named as defendants the District of Columbia, the District of Columbia Housing Authority ("DCHA") and Investigator Paul Sinclair, an employee in the DCHA's Office of Public Safety. However, her claims against them were dismissed.

2. The check was in the amount of $801.46.

not reimbursed by the DCHA. He then met with Investigator Paul Sinclair twice regarding the matter. At their first meeting Investigator Sinclair explained that the agency would not pay him for the check. And at their second meeting Mr. Hahn claimed that he knew Ms. Carter and that she was the person who cashed the check at his store. Investigator Sinclair verified as much in a sworn affidavit and obtained a warrant for Ms. Carter's arrest. Officers with the Metropolitan Police Department then apprehended her on June 23, 1999, at the DCHA's offices, charged her with theft and held her overnight. Unbeknownst to Investigator Sinclair or any of the officers, this information was false.

Shortly before trial on August 25, 1999, authorities held a line-up and learned that Mr. Hahn could not identify Ms. Carter. So they dropped the charges against her.[3] She then filed a civil complaint; and Mr. Hahn subsequently recanted his claims.

The case was tried before a jury as one for defamation and intentional infliction of emotional distress. After the completion of Ms. Carter's case-in-chief, the trial court granted a directed verdict on behalf of Mr. Hahn because a "qualified privilege is a complete defense ... to defamation....," except where malice is shown; and Ms. Carter failed to establish malice. The trial court also granted a directed verdict on Ms. Carter's intentional infliction of emotional distress claim because of her alleged failure to prove that Mr. Hahn's conduct "was extreme or outrageous or ... intentionally reckless."

## ANALYSIS

Ms. Carter contends that in directing a verdict against her on her intentional infliction of emotional distress and defamation claims the trial court "completely ignored" the statement Mr. Hahn made to Investigator Sinclair. She claims that jurors could have reasonably inferred from this evidence, and Mr. Hahn's subsequent actions, that he "lied" in an effort to gain "the assistance of the criminal justice system to recover his money" regardless of the consequences to her.

■ A directed verdict is proper " '[i]f during a trial by jury [Ms. Carter] has been fully heard with respect to [her claim], and there is no legally sufficient evidentiary basis for a reasonable jury to have found for [her].' " *Abebe v. Benitez*, 667 A.2d 834, 835–36 (D.C.1995) (quoting Super. Ct. Civ. R. 50(a)(1)). Accordingly, "[a] verdict may be directed only if it is clear that [she] has not established a prima facie case." *Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095, 1097 (D.C.1994) (internal quotations and citations omitted). Furthermore, since the trial court is not the trier of fact it "must take care to avoid weighing the evidence, passing on the credibility of witnesses, or substituting its judgment for that of the jury." *Abebe, supra,* 667 A.2d at 836 (internal quotations and citations omitted). And "[i]n reviewing a directed verdict, we view the facts, as the trial court was required to, in the light most favorable to [Ms. Carter]." *Haynesworth, supra,* 645 A.2d at 1097 (internal quotations and citations omitted).

■ Moreover, "[t]o establish a *prima facie* case of intentional infliction of emotional distress, [Ms. Carter] must show (1) extreme and outrageous conduct on the part of [Mr. Hahn] which (2) either intentionally or recklessly (3) cause[d][her] severe emotional distress." *Larijani v. Georgetown Univ.,* 791 A.2d 41, 44 (D.C. 2002) (citations omitted). "Liability will not be imposed for mere insults, indigni-

---

**3.** In response to the charges, the DCHA initially suspended, then terminated, Ms. Carter's employment. But the agency reinstated her and awarded her back pay once the charges were dismissed.

ties, threats, annoyances, petty oppressions, or other trivialities." *Homan v. Goyal*, 711 A.2d 812, 818 (D.C.1998) (internal quotations and citations omitted) (amended by, 720 A.2d 1152 (D.C.1998)). But it is properly imposed where the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Larijani, supra*, 791 A.2d at 44 (internal quotations and citations omitted).

■ To prove defamation, " '[a] plaintiff bringing a defamation action ... must show: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.' " *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C.2001) (quoting *Crowley v. North American Telecomms. Assoc.*, 691 A.2d 1169, 1173 n. 2 (D.C.1997) (other citation omitted)).

Here, the evidence, as viewed in the light most favorable to Ms. Carter, indicates that reasonable jurors could find Mr. Hahn intentionally and recklessly lied about Ms. Carter's theft of government funds. According to Investigator Sinclair Mr. Hahn initially came to his office in early June 1999 claiming that "he didn't understand why" the agency stopped payment on the check. He interviewed Mr.

Hahn briefly, then investigated the matter further. Subsequently, he went to Mr. Hahn's store at a later date and interviewed him again. At that point, for the first time, Mr. Hahn claimed that he knew Ms. Carter. He indicated that his surveillance equipment had malfunctioned so he was unable to record the transaction. But he maintained that "he kn[e]w[ ][her] very well ... because [she] ... c[a]me[ ] in his ... business regularly to cash checks." Based on this information, Investigator Sinclair completed a sworn affidavit and obtained an arrest warrant for her. Authorities then apprehended Ms. Carter and charged her with theft.

For the next month and a half, according to the record, Mr. Hahn's claims remained unchanged. However, on the eve of the criminal trial a line-up was held and Mr. Hahn was "unable to identify [Ms. Carter]." And soon after she filed her civil complaint, Mr. Hahn recanted his story completely-claiming that he never told Investigator Sinclair any of the above.[4] However, when he learned of this retraction, Investigator Sinclair was surprised and testified that "[he] wouldn't have obtained an affidavit" for an arrest warrant had Mr. Hahn admitted earlier that he did not know Ms. Carter.[5] Furthermore, according to Ms. Carter, she did not endorse the check, had never cashed her paycheck at Mr. Hahn's store[6] and "had never seen Mr. Hahn before" the criminal trial. Nonetheless, as a result of the charges filed against her, she was jailed overnight.

She testified that authorities "handcuffed [her in her office] and ... carried [her] to the front of [the DCHA] building"

---

**4.** Mr. Hahn did not testify, but in his pleadings he "categorically denie[d]" making the statement and his counsel argued accordingly at trial.

**5.** He also said that Mr. Hahn claimed that she showed him her DCHA identification badge

during the transaction. However, Ms. Carter testified that she was always in possession of her badge and had never lent it to anyone.

**6.** The record indicates that her prior paychecks were deposited directly into her bank account.

where they held her for about fifteen minutes as several of her co-workers observed. After another police officer arrived they "frisked [her] down and . . . put [her] in [a squad] car" and took her to a nearby police station. Despite her denials, officers took her fingerprints and mug shots and placed her in a cell with up to "seven" other prisoners and held her overnight. The next morning she was handcuffed and transported to the courthouse "[i]n a pa[dd]y wagon."

She had never been arrested before and the experience "horrified" her. She was "mad, scared, hurt . . . [and] devastated [at the time and] couldn't eat . . . [or] sleep." And she still "ha[s] nightmares sometimes" and "crying spells" related to her experience.[7]

In rendering its ruling, the trial court acknowledged the testimony of Ms. Carter and Investigator Sinclair, as well as the statement given by Mr. Hahn to the investigator. Nevertheless, the trial court concluded that Mr. Hahn was entitled to a qualified privilege as to the defamation claim because he had been reporting to the police and "there [was] no showing of malice." And, with respect to Ms. Carter's intentional infliction of emotional distress claim, there was "absolutely no evidence whatsoever of any conduct on the part of Mr. Hahn that was extreme or outrageous or that was intentionally reckless."

■■■ We turn first to the trial court's conclusion regarding defamation and qualified privilege. "[A] qualified privilege exists when a statement about suspected wrongdoing is made in good faith to law enforcement authorities." *Columbia First Bank v. Ferguson,* 665 A.2d 650, 655 (D.C. 1995) (citations omitted). "Whether a statement is protected by a privilege is a

question of law for the [trial] court." *Id.* (citation omitted). Furthermore, "[t]he qualified privilege is a complete defense to [defamation]" unless there is a showing of malice. *Id.* at 656 (internal quotations and citation omitted). That term has been defined as the commission "of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." *Id.* (citation omitted). Moreover, "all definitions [of malice] in substance come down to the equivalent of bad faith" which jurors could reasonably find existed on the part of Mr. Hahn as explained above. *Id.* at 656 n. 8 (internal quotations and citations omitted).

In concluding that there was "no showing of malice" based on the record, the trial court stated that: "in reporting the suspected . . . wrongdoing to law enforcement authorities Mr. Hahn relied on a comparison of the person's ID and that person['s] appearance with a signature on the ID and the signature on the check as well as the fact that he observed the person." It further pointed out that Investigator Sinclair testified that the signatures on the check and in Ms. Carter's personnel file "are the same"; and it found them to be "substantially similar" as well. However, these observations only verify that Mr. Hahn cashed the check in good faith. They have no bearing on whether his subsequent statement to Investigator Sinclair (regarding his familiarity with Ms. Carter) was made in the same manner or in bad faith.

■■■ Based on the testimony of Ms. Carter and Investigator Sinclair, reasonable jurors could find that Mr. Hahn intentionally or recklessly lied about knowing

---

7. She also testified that she continues to "have problems with [her] right hand from the handcuffs" that were placed on her.

Ms. Carter " 'very well' " because she regularly cashed her checks at his store; and further reasonably could conclude that Mr. Hahn's lies resulted in the accusation that Ms. Carter stole government funds, thus " 'injur[ing Ms. Carter] in [her] trade, profession or community standing or lower[ing] [her] in the estimation of the community.' " *Beeton, supra,* 779 A.2d at 923 (quoting *Guildford Transp. Indus., Inc. v. Wilner,* 760 A.2d 580, 594 (D.C.2000) (other citation omitted)).

While mistakenly "calling the police and informing them that someone is [committing a criminal act] [may not be] sufficiently outrageous conduct to warrant the recovery of damages for intentional infliction of emotional distress even if those statements are false," *see Halbert v. City of Sherman,* 33 F.3d 526, 529 (5th Cir.1994), intentionally or recklessly doing so may rise to that level in this case, particularly since laws prohibit making false representations to public authorities. *See e.g., United States v. Crop Growers Corp.,* 954 F.Supp. 335, 349 (D.D.C.1997). Given the testimony of Ms. Carter and Mr. Sinclair, reasonable jurors could have concluded that Mr. Hahn's conduct in making false statements about his knowledge of and contact with Ms. Carter were extreme and outrageous, and designed only to get his money back for cashing a check made out to Ms. Carter.

Under the circumstances, the trial court's directed verdict judgment was improper, both with respect to the defamation and intentional infliction of emotional distress claims. Accordingly, for the foregoing reasons, we reverse the judgment of the trial court and remand this case for a new trial.