Audrick PAYNE, Appellant,

v.

William CLARK, et al., Appellees.

No. 09–CV–1492.

District of Columbia Court of Appeals.

Argued Nov. 1, 2010.
Decided Aug. 4, 2011.

David A. Branch for appellant.

Samuel T. Wolf, with whom Jeffrey R. Schmieler, Silver Spring, MD, and Alan B. Neurick, Baltimore, MD, were on the brief, for appellees.

Before BLACKBURNE–RIGSBY,* Associate Judge, REID,** Associate Judge, Retired, and STEADMAN, Senior Judge.

REID, Associate Judge, Retired:

This appeal pertains to claims for defamation and intentional interference with contractual relations filed by Audrick Payne, appellant, against William Clark and Blake Real Estate, Inc. ("Blake"), appellees. Mr. Payne alleged that William Clark, an employee of Blake, falsely and maliciously asserted in a sworn statement

---

* Judge Kramer was assigned to this case at the time of argument. Following her retirement on May 1, 2011, Judge Blackburne–Rigsby was assigned to take her place.

** Judge Reid was an Associate Judge of the court at the time of argument. Judge Reid's status changed to Associate Judge, Retired, on April 7, 2011.

to Mr. Payne's employer, the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA"), that Mr. Payne brought two unauthorized individuals to an elevator inspection and solicited business for his own private company, in violation of the District's law and personnel regulations. The trial court granted defendants' motion for summary judgment, determining that Mr. Clark's statement was protected by the common interest qualified privilege, and that Mr. Payne failed to rebut the privilege by presenting sufficient evidence to demonstrate the existence of a genuine issue as to any material fact concerning whether Mr. Clark acted with express malice or malice in fact. We hold, on this record, that as to Mr. Payne's defamation claim, the trial court properly concluded that defendants/appellees were entitled to the common interest privilege, but that summary judgment was improper because Mr. Payne proffered sufficient evidence, if believed by properly instructed and reasonable jurors, to raise a genuine issue of material fact as to whether Mr. Clark acted with malice in making the statements in question against Mr. Payne.

## FACTUAL SUMMARY

Mr. Payne was employed as a DS–12 certified elevator inspector with the DCRA from September 2001 through September 2007. In his position, he was responsible for inspecting elevators in the District of Columbia and issuing citations to building owners who were not in compliance with District of Columbia law. Shortly after he became employed with DCRA, he observed that several companies regulated by DCRA were not in compliance with the

law. He also noticed that, in 2002, the District had begun permitting third parties to conduct inspections of elevators without being required to undergo training administered by the District of Columbia government.

In 2005, Mr. Payne began speaking publicly about what he perceived to be pervasive problems with the practices of third-party elevator inspectors. Mr. Payne was one of only two certified elevator inspectors in the District when he told The Washington Post that he had spot-checked more than 200 inspections performed by third-party companies and found problems in every case. He also testified before the Council of the District of Columbia in 2005 and 2006 regarding improper DCRA activities and reported his concerns to the District of Columbia Office of the Inspector General ("OIG") and other agencies. Mr. Payne was featured in an April 2008 Washington Post article on whistleblowers.

One of the elevator inspections Mr. Payne conducted in 2005 occurred at 1150 Connecticut Avenue, in the Northwest quadrant of the District of Columbia, in a building owned by Blake. Following the September 28, 2005 inspection, Mr. Payne reported safety violations to DCRA and shut down one of the building's elevators. Mr. Payne met with Mr. Clark, Blake's Director of Operations, to discuss the violations. Mr. Payne re-inspected elevators at the same building on November 1 and November 6, 2005, and again reported safety violations.

On July 12, 2007, DCRA sought to terminate Mr. Payne, alleging violations of D.C.Code § 1–618.02 [1] and District Personnel Manual, 6–B DCMR §§ 1800.3,[2]

---

**1.** D.C.Code § 1–618.02 (2006 Repl.) states: "No employee of the District government shall engage in outside employment or private business activity or have any direct or indirect financial interest that conflicts or would ap-

pear to conflict with the fair, impartial, and objective performance of officially assigned duties and responsibilities."

**2.** 6–B DCMR § 1800.3 provides: "No employee of the District government shall en-

1803,[3] 1804,[4] 1805,[5] and 1813.[6] Specifically, DCRA alleged that Mr. Payne solicited elevator inspection and consulting work for his private commercial business, Payne and Associates, Inc., accepted favors from persons regulated by DCRA who had a specific interest in his decision whether or not to shut down elevators, and used government time for other than official business, including the promotion of his private business and training employees in that business during work hours.[7] A hearing officer who reviewed DCRA's documentation supporting its termination decision recommended Mr. Payne's removal on September 15, 2007. DCRA adopted the hearing officer's recommendation and terminated Mr. Payne effective September 18, 2007.

Included in DCRA's materials supporting its July 2007 proposal to terminate Mr. Payne were statements of individuals who claimed Mr. Payne solicited business from them. One of those statements was from Mr. Clark who recounted his encounter with Mr. Payne at a November 6, 2005 reinspection meeting. Mr. Clark agreed to participate in DCRA's investigation of Mr. Payne's conduct after he received an email on June 21, 2007 from Nicole Y. Whiteman of the Apartment and Office Building Association ("AOBA"). Ms. Whiteman's email to Mr. Clark stated in part:

> DCRA's General Counsel, Jill Stern, contacted me regarding their investigation of Audrick Payne. (He is not at DCRA but there are some remaining steps they need to take to make sure he never returns). They are looking for persons who can sign an affidavit attesting to their receiving his personal business card while performing work for the District. . . .

---

gage in outside employment or private business activity or have any direct or indirect financial interest that conflicts or would appear to conflict with the fair, impartial, and objective performance of officially assigned duties and responsibilities."

3. 6–B DCMR § 1803 contains a comprehensive list of the responsibilities of District employees, including a prohibition on the acceptance of gifts, defined in part as "any gratuity . . ., entertainment, or other like thing of value." 6–B DCMR § 1803.2(a) and (b).

4. 6–B DCMR § 1804 specifies prohibitions on outside employment and activity, including a prohibition on "[e]ngaging in any outside employment, private business activity, or interest which permits an employee, or others, to capitalize on his or her official title or position." 6–B DCMR § 1804.1(e).

5. 6–B DCMR § 1805 concerns financial interests of employees, and 6–B DCMR § 1805.2 specifies:

> No District employee, or any member of his or her immediate household, may acquire an interest in or operate any business or commercial enterprise which is in any way

related, directly or indirectly, to the employee's official duties, or which might otherwise be involved in an official action taken or recommended by the employee, or which is in any way related to matters over which the employee could wield any influence, official or otherwise.

6. 6–B DCMR § 1813 sets forth rules relating to the reporting of financial interests.

7. DCRA attempted to terminate Mr. Payne on two previous occasions. On August 30, 2002, DCRA notified Mr. Payne that he would be terminated at the end of his probationary period, effective September 4, 2002. But, he was reinstated and compensated with back pay because the termination notice he received was defective. On November 9, 2006, DCRA terminated Mr. Payne following an investigation conducted by the OIG between August 2005 and May 2006 regarding alleged violations of D.C.Code § 1–618.02. Mr. Payne was reinstated to his position on June 27, 2007, however, following an administrative review by a hearing officer who determined that, due to certain mitigating factors, the penalty of removal should be reduced to a suspension.

Mr. Payne was interviewed by DCRA Investigator Justo Diaz on June 22, 2007 and he provided Mr. Diaz with a statement. On July 12, 2007, Mr. Clark executed an affidavit reiterating the information from his previous interview and statement. He revised his affidavit on July 11, 2007 in order to address inaccuracies regarding his encounter with Mr. Payne.

Mr. Clark claimed in his interview and initial affidavit that, on November 6, 2005, Mr. Payne brought his wife and another employee to the elevator re-inspection meeting at 1150 Connecticut Avenue, Northwest, and indicated that he was training his wife and the other individual to become elevator inspectors for his private business. Mr. Clark also asserted that he and another individual subsequently went to lunch with Mr. Clark at The Daily Grill to discuss Mr. Payne's inspection approach. The lunch was paid for by a person regulated by DCRA, whom Mr. Clark declined to identify. The hearing officer found that other evidence corroborated Mr. Clark's statement regarding Mr. Payne's use of government time to promote his business, but not Mr. Payne's acceptance of a favor (lunch) from a person regulated by DCRA. Finding no mitigating factors, the hearing officer recommended that DCRA's proposed termination be upheld. Subsequently, the union, AFGE Local 2725, filed a grievance on behalf of Mr. Payne, and on October 5, 2009, an arbitrator for the Federal Mediation and Conciliation Service issued an arbitration award stating: "The grievance is sustained in part, and the removal of Mr. Payne is ruled improper. The parties are directed to negotiate on the remedial issues set forth in the award."[8]

On July 14, 2008, Mr. Payne filed a complaint against Blake and Mr. Clark requesting compensatory and punitive damages for alleged defamation arising from the statement Mr. Clark made in his July 2007 affidavit while acting on behalf of Blake and in the course of the DCRA investigation. Mr. Payne amended his complaint on October 24, 2008, adding a claim for intentional interference with contractual relations.

The trial court granted defendants' motion for summary judgment on November 3, 2009. The court determined that Mr. Clark's statement was protected by the common interest privilege because the statement was "made in good faith at the request of a DCRA investigator ... con-

8. The rationale for the arbitrator's award was not included with Mr. Payne's exhibits. However, on October 6, 2010, counsel for defendants filed a Rule 28(k) letter attaching a Memorandum Opinion, dated September 29, 2010, and issued by a United States District Court judge in *Audrick Payne v. District of Columbia, et al.,* 741 F.Supp.2d 196 (D.D.C. 2010) regarding Whistleblower Protection Act, First Amendment and Fifth Amendment claims filed by Mr. Payne in the federal court. The opinion summarized the arbitrator's rationale and the judge stated, in part:

Ultimately, the arbitrator found that DCRA was able to prove by a preponderance of the evidence only that [Mr.] Payne had promoted his personal business by distributing a few of his business cards and engaging in some discussions about his business.... The arbitrator concluded ... that [Mr.] Payne's actions did create a conflict of interest, or [at] least the appearance of one, in violation of D.C. law. The arbitrator also found that DCRA had failed to give [Mr.] Payne appropriate guidance with respect to how he could ethically promote his personal business while keeping his job as an elevator inspector. The arbitrator concluded that DCRA had failed to prove that [Mr.] Payne engaged in egregious conduct justifying immediate removal without consideration of progressive discipline or mitigating circumstances, and therefore DCRA lacked cause to summarily remove him. However, the arbitrator declined to determine a remedy, ordering the parties to further negotiate an appropriate remedy. Memorandum Opinion, at 10.

cerning a subject matter in which both defendant Clark and the DCRA had a legitimate interest." The court also found that Mr. Clark and DCRA "had an interest in the subject matter of the communication"; DCRA had an interest in ensuring that elevator inspectors do not solicit private business in the course of their employment as public employees and defendants have an interest in proper elevator inspections by District employees. As to the question whether Mr. Payne presented sufficient evidence to establish a genuine issue of material fact, the trial court declared that he had "offer[ed] conclusory allegations" and had made a "bare assertion that the allegations [made by Mr. Clark] are false." Hence, the trial court determined that Mr. Payne's proffered evidence in opposition to defendants' motion for summary judgment was insufficient to raise a genuine issue of material fact as to whether Mr. Clark acted with malice.

## ANALYSIS

Mr. Payne asserts that the trial court erred in granting defendants' motion for summary judgment on his claims for defamation and intentional interference with contractual relations. Specifically, he argues that defendants were not entitled to summary judgment as a matter of law, based on their assertion of a common interest privilege, because disputed issues of material fact exist as to whether Mr. Clark's statement was made "in good faith" and "without malice."

■■■ "We review the trial court's grant of a summary judgment motion *de novo* [.]" *Woodfield v. Providence Hosp.*, 779 A.2d 933, 936 (D.C.2001) (citations omitted). " 'Summary judgment is appropriate only when there are no material facts in issue and when it is clear that the moving party is entitled to judgment as a matter of law.' " *Blodgett v. The Universi-*

*ty Club*, 930 A.2d 210, 217 (D.C.2007) (quoting *Puma v. Sullivan*, 746 A.2d 871, 874 (D.C.2000)). "In reviewing a trial court order granting a summary judgment motion, 'we conduct an independent review of the record. . . .' " *Id.* (quoting *Wallasey Tenants Ass'n v. Varner*, 892 A.2d 1135, 1138 (D.C.2006)). "We must view the record in the light most favorable to the non-moving party." *Id.* "[M]ere conclusory allegations are insufficient to avoid entry of summary judgment." *Id.* (citing *Musa v. Continental Ins. Co.*, 644 A.2d 999, 1002 (D.C.1994); Super. Ct. Civ. R. 56(e)). " 'The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].' " *LaPrade v. Rosinsky*, 882 A.2d 192, 196 (D.C.2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

■■ "A statement is 'defamatory' if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Clawson v. St. Louis Post–Dispatch, LLC*, 906 A.2d 308, 313 (D.C.2006) (citation omitted). "To state a cause of action for defamation, a plaintiff must allege . . . :(1) that the defendant made a false or defamatory statement concerning the plaintiff; (2) that the defendant published the statement *without privilege* to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Blodgett, supra*, 930 A.2d at 222 (citation omitted) (emphasis added).

■ "Qualified or conditional privileges 'are based upon a public policy that recognizes that it is desirable that true

information be given whenever it is reasonably necessary for the protection of the actor's own interests, the interests of a third person or certain interests of the public.'" *Moss v. Stockard,* 580 A.2d 1011, 1024 (D.C.1990) (quoting RESTATEMENT (SECOND) OF TORTS, title B introductory note (1977)). A statement is protected by the common interest privilege if it is "(1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has or honestly believes he has a duty (3) to a person who has such a corresponding interest or duty." *Id.* (citations omitted). Whether a statement is privileged is a question of law. *Carter v. Hahn,* 821 A.2d 890, 894 (D.C.2003). If a statement is subject to the common interest privilege, "the burden is on the plaintiff to prove the privilege has been abused." *Blodgett,* 930 A.2d at 224 (citations omitted). Where the court determines that the common interest privilege is applicable, "the defendant 'will be presumed to have been actuated by pure motives in its publication[, and] [i]n order to rebut this presumption, express malice or malice in fact must be shown [by the plaintiff].'" *Moss,* 580 A.2d at 1024 (citing *Ford Motor Credit v. Holland,* 367 A.2d 1311, 1314 (D.C.1977) (other citation omitted)). "Unless the statement itself is 'so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that the defendant was actuated by express malice,' malice must be proved by extrinsic evidence." *Id.* (internal quotation marks and citation omitted).

▆▆▆ *Moss* cautions that express malice in the context of the qualified common interest privilege is not the same as malice in the context of First Amendment constitutional privilege. "Malice, in the context of a qualified privilege, is the

equivalent of bad faith. It is the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." *Moss, supra,* 580 A.2d at 1025 (citing *Mosrie v. Trussell,* 467 A.2d 475, 477 (D.C.1983) (other citations omitted)). "[T]he requirement of 'malice', for purposes of overcoming a common law qualified privilege, is [not] satisfied if the defendant has done no more than to fail to undertake a reasonable inquiry as to the truth of the assertion prior to publication—conduct amounting to ordinary negligence." *Id.* (footnote omitted). "[T]he statement must be published at least with reckless or callous disregard for its effect upon the reputation of the plaintiff." *Id.* (footnote omitted). Thus, "[c]ommon law malice is to be distinguished from the constitutional *New York Times*[9] 'actual malice' standard." *Id.* at 1026 n. 29. "The former looks to ill will or enmity as the primary motive of the defendant...." *Id.* (citing *Mosrie, supra,* 467 A.2d at 477). The "actual malice" constitutional "standard is rooted in the First Amendment and in society's interest in free expression concerning public officials and public figures," and focuses on "the speaker [who] publishes defamation with knowledge of its falsity or with reckless disregard of whether it was false or not." *Id.* (citation omitted).

▆▆▆ Furthermore, to discern whether the plaintiff has presented sufficient evidence to demonstrate material facts in issue with respect to the applicability of the common interest privilege, this court "looks to the primary motive by which the defendant is apparently inspired; and, the fact that [the defendant] feels resentment and indignation towards

9. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

the plaintiff and enjoys defaming him will *not* forfeit the privilege so long as the primary purpose [of the statement] is to further the interest which is entitled to protection." *Mosrie,* 467 A.2d at 477–78 (citations omitted) (emphasis in original); *see also Blodgett,* 930 A.2d at 224. Hence, "the mere existence of ill will on the part of the publisher toward the subject of the publication does not defeat the publisher's privilege if the privilege is otherwise established by the occasion and a proper purpose." *Mosrie,* 467 A.2d at 477 (citations omitted). "Whether a person acts with malice is ordinarily a question of fact for the jury." *Oparaugo v. Watts,* 884 A.2d 63, 82 (D.C.2005) (citation omitted); *Mosrie,* 467 A.2d at 477 ("while the existence of the privilege is a question of law for the court, whether it was abused by the defendant, is a question of fact by the jury") (citations omitted).

▪ We turn now to Mr. Payne's arguments against the applicability of the common interest privilege to this case. First, Mr. Payne argues that the trial court erred in granting summary judgment based on the privilege because "[t]he privilege has been applied to employers or organizations reporting information on their own employees or members," and "the courts have not extended it to third parties who have made reckless accusations after being sanctioned by the government for violations of the law such as the defendants in this case." The trial court found, citing *Blodgett,* "that defendant Clark and the DCRA had an interest in the subject matter of the communication[,]" and that "[t]he DCRA has a compelling interest to ensure that elevator inspectors are not soliciting private business in the course of their employment as public employees." The court stated, in addition, that "defendants—as parties that oversee buildings with elevators—have an

interest in proper city inspections of elevators." We agree.

Contrary to Mr. Payne's argument, we have never limited the privilege to "employers or organizations reporting information on their own employees or members." As we explained in *Moss, supra,* a qualified privilege may "protect[ ] the actor's own interests, the interests of a third person or certain interests of the public." *Id.* at 1024 (citation and internal quotation marks omitted). In that vein, in addition to a statement made by an employer regarding the conduct of an employee, *see Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 879 (D.C.1998), we have recognized the qualified common interest privilege in the context of statements that (1) were made in good faith to law enforcement authorities by private individuals regarding suspected wrongdoing, *Carter,* 821 A.2d at 894; *Columbia First Bank v. Ferguson,* 665 A.2d 650, 655 (D.C. 1995), (2) were made to allege misconduct of a police officer to his superior, *Mosrie, supra,* 467 A.2d at 477, and (3) involved communication between church members (non-employees) concerning matters of mutual concern or common interest, *Heard v. Johnson,* 810 A.2d 871, 886 n. 6 (D.C. 2002).

Mr. Clark's statement is akin to reporting suspected wrongdoing to law enforcement authorities, *see Carter,* 821 A.2d at 894. In addition, Mr. Clark, Blake, and DCRA have a common interest in the integrity of elevator inspections. Mr. Payne does not dispute that the statement at issue was made following a request by DCRA for Mr. Clark's participation in an investigation into alleged misconduct by Mr. Payne, a District employee. Mr. Payne also does not dispute that DCRA conducted this investigation pursuant to District of Columbia laws and regulations prohibiting District employees from engag-

ing in private business activity or having a financial interest that conflicts or appears to conflict with the "fair, impartial, and objective performance of officially assigned duties and responsibilities." D.C.Code § 1–618.02 (2001); 6–B DCMR § 1800.3; *see also* 6–B DCMR § 1803.1(a)(1) (prohibiting the use of an official position for private gain); 6–B DCMR § 1803.1(a)(6) (prohibiting conduct that adversely affects the public's confidence in the integrity of District government). The District's Personnel Regulations mandate "[t]he maintenance of unusually high standards of honesty, integrity, impartiality, and conduct by employees ... essential to assure the proper performance of government business and the maintenance of confidence by citizens in their government." 6–B DCMR § 1800.2. Given the District's interest in maintaining high ethical standards among District employees and confidence in District government among its citizens, and in light of Blake's and Mr. Clark's corresponding interest, we conclude that a qualified common interest privilege protects statements made by citizens and other third parties who communicate in good faith with District agencies during an investigation into alleged misconduct by District employees. This interpretation of the common interest privilege comports with prior precedent in this jurisdiction recognizing a qualified privilege for statements made by private citizens to law enforcement authorities regarding suspected violations of the law.[10]

■ The trial court properly determined that the qualified common interest privilege is applicable to this case. Hence, Mr. Clark is "presumed to have been actuated by pure motives in [his] publication."

*Moss, supra,* 580 A.2d at 1024 (citing *Ford Motor Credit, supra,* 367 A.2d at 1314). And, the burden shifts to Mr. Payne to rebut the presumption by demonstrating that the statement was made out of express malice or malice in fact, *id.,* that is, that Mr. Clark and Blake were motivated primarily by bad faith or "ill will or enmity[.]" *Id.* at 1026 n. 29 (citing *Mosrie, supra,* 467 A.2d at 477).

■ Mr. Payne's second argument addresses his burden to rebut the presumption with which Mr. Clark's statement is cloaked. He contends that the trial court erred in granting defendants' motion for summary judgment essentially because the issue of "malice" "is a factual issue which can only be decided by a jury" and because the trial judge made an improper "credibility finding." He maintains that Mr. Clark made false accusations against him which he later recanted, that defendants "had an axe to grind against Mr. Payne" because he reported elevator violations at Blake's building, and that there "are significant facts in the record, ignored by the trial judge[,]" including the "17 months" delay in reporting Mr. Payne's alleged misconduct to DCRA.

The record shows that Mr. Payne filed a twenty-three page opposition to defendants' motion for summary judgment and attached twelve exhibits, including his own sworn declaration; notices of violations issued against Blake's property following inspections by Mr. Payne on September 28, 2005, November 1, 2005, and November 6, 2005; a letter from Blake to DCRA, dated November 7, 2005, seeking to restore one of three affected elevators to service; a letter of July 10, 2006 from Blake to DCRA addressing a violation found during

---

**10.** *See, e.g., Carter, supra,* 821 A.2d at 894; *Columbia First Bank, supra,* 665 A.2d at 655. *See also A & B–Abell Elevator Co., Inc. v. Columbus/Centr'l Ohio Bldg. and Constr.* *Trades Council,* 73 Ohio St.3d 1, 651 N.E.2d 1283, 1291 (1995) (applying a qualified privilege to statements made in the context of a city investigation into alleged bid-rigging).

Mr. Payne's July 10, 2006 inspection, and seeking permission to run at least one of two affected elevators; proposed and final notices (dated July and September 2007) regarding termination of Mr. Payne's employment with DCRA; and an arbitration award, dated October 5, 2009, indicating that "the removal of Mr. Payne is ruled improper."

Without specifically discussing Mr. Payne's opposition to defendants/appellees' motion for summary judgment, including the attachments to the opposition, the trial court stated:

> Even crediting plaintiff's allegations as true, the allegations fail to establish a genuine issue of material fact as to whether defendant acted with malice because "the mere existence of ill will on the part of [defendant] does not defeat the publisher's privilege." [citing *Mosrie*] Indeed, plaintiff must do more than offer conclusory allegations to establish a genuine issue of material fact as to malice. [citing *Blodgett* and another case] Similarly, plaintiff's bare assertion that the allegations are false also fails to create a genuine issue of material fact as to malice. [citing *Moss*] Accordingly, plaintiff has failed to establish a genuine issue of material fact because he has not provided any evidence to substantiate his assertion that defendant Clark acted with malice when responding to DCRA's request for information. As such, plaintiff cannot defeat the common interest privilege that attaches to defendant Clark's response to DCRA's investigation of plaintiff.

We conclude that Mr. Payne's opposition and his exhibits are sufficient to raise a factual issue as to whether Mr. Clark's primary purpose in making his statement against Mr. Payne, *see Mosrie*, 467 A.2d at 477–78, was to further the District's and Blake's common interest in elevator inspections unfettered by an elevator inspector's conflict of interest or bias; or whether his primary purpose was to further his and Blake's interest in punishing Mr. Payne for finding elevator violations at Blake's property, that is, to cause Mr. Payne to be fired from his position as an elevator inspector, or as Ms. Whiteman of AOBA put it in her email of June 27, 2007: "to make sure [Mr. Payne] never returns [to DCRA]."

Viewing the evidence in the light most favorable to Mr. Payne, as we must when considering a motion for summary judgment issued in favor of defendants, *Blodgett, supra*, the trial court was presented with exhibits showing that Mr. Payne's elevator inspections (1) resulted in notices of violation against Blake on four different occasions between September 28, 2005 and July 10, 2006, requiring the shutdown of elevators in Blake's building and necessitating letters from Blake to DCRA in an effort to restore at least one elevator to service; and (2) a June 27, 2007 email from an apartment building association representative to Mr. Clark concerning DCRA's investigation of Mr. Payne which indicated that Mr. Payne was "not at DCRA but there are some remaining steps they need to take to make sure he never returns." The evidence presented by the exhibits also included (1) Mr. Payne's sworn declaration detailing, in part, his work on elevator safety issues, his comments about those issues to the news media (coupled with exhibits from the media), and alleged false statements made by Mr. Clark; and (2) an arbitration award statement indicating that his removal from DCRA was "ruled improper."[11] Defendants' exhibits attached to their summary judgment motion focused on efforts of DCRA to termi-

---

11. Defendants moved to strike Mr. Payne's exhibits, but the trial court denied the motion "as moot" after its decision to grant summary judgment in favor of defendants.

nate Mr. Payne, affidavits of Mr. Clark, and Ms. Whiteman's email.[12]

The trial court centered its attention on Mr. Clark's statement that Mr. Payne: "brought to the inspection [of November 6, 2005] two individuals—one individual is alleged to have been his wife—for the purpose of training them to be elevator inspectors for [Mr. Payne's] personal elevator business ... [and] provided him with a business card pertaining to plaintiff's personal elevator inspection company." We have said that:

> [I]f the language of the communication and the circumstances attending its publication by the defendant are as consistent with the nonexistence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant.

*Mosrie, supra,* 467 A.2d at 478 (citations omitted). Mr. Clark made his statements in response to a DCRA investigation under circumstances in which (1) DCRA had taken steps since 2002 to terminate Mr. Payne; (2) Mr. Payne had cited Blake for elevator violations resulting in the shutdown of three elevators and prompting letters from Blake requesting restoration of service by at least one elevator; (3) an apartment building representative made efforts, including a communication to Mr. Clark, to help DCRA find persons who could provide evidence against Mr. Payne

because even though Mr. Payne "is not at DCRA ... there are some remaining steps that they need to take to make sure he never returns"; (4) Mr. Clark was wrong about the details of the lunch at The Daily Grille since the hearing officer found that there was no evidence substantiating Mr. Payne's acceptance of a favor (lunch) from a person regulated by DCRA; and (5) Mr. Clark was unable to provide any good descriptions of the wife and/or the third party who attended the November 6, 2005 re-inspection meeting at 1150 Connecticut Avenue. Significantly, if reasonable jurors, after hearing from both Mr. Payne and Mr. Clark, concluded that Mr. Clark was wrong in his assertions against Mr. Payne, it is hard to see how he would have been wrong except deliberately; that is, if properly instructed reasonable jurors concluded there was malice based on the evidence presented, we would be hard put to say that the evidence was insufficient. In that case, summary judgment would be improper.

In light of these circumstances and the exhibits presented by both parties we cannot say that "the language of [Mr. Clark's] communication and the circumstances attending its publication by [Mr. Clark] are as consistent with the nonexistence of malice as with its existence[.]" *Mosrie, supra,* 467 A.2d at 478. Nor can we say that Mr. Clark made his statement without "such a conscious indifference or reckless disre-

**12.** Defendants' exhibits included: (1) August 30, 2002 termination letter from DCRA to Mr. Payne and a reinstatement letter from DCRA to Mr. Payne, dated October 29, 2002; (2) DCRA's November 20, 2006 summary termination letter to Mr. Payne, the hearing examiner's decision finding a violation by Mr. Payne of District regulations pertaining to his private business but recommending immediate reinstatement, and DCRA's July 27, 2007 letter rescinding summary removal; (3) DCRA's July 2007 notice of proposed removal of Mr. Payne and the September 2007 hearing officer's recommendation that the removal be upheld; (4) July 12, 2007 affidavit of Mr. Clark stating that Mr. Clark's wife was present at a November 6, 2005 inspection and that at a subsequent lunch Mr. Payne gave him his business card and the lunch was paid for by another individual who was present; (5) Ms. Whiteman's email to Mr. Clark; (6) Mr. Clark's interview with a DCRA investigator; (7) Mr. Clark's email indicating changes to his affidavit; and (8) Mr. Clark's August 13, 2009 affidavit which among other things disclaimed any ill will or malice toward Mr. Payne.

gard as to its results or effects upon the rights or feelings of [Mr. Payne,]" or without such "reckless or callous disregard for its effect upon the reputation of [Mr. Payne]." *Moss, supra,* 580 A.2d at 1025, 1026. Mr. Payne's evidence demonstrates more than conclusory allegations or bare assertions, and does not rest solely on Mr. Payne's allegations that Mr. Clark's assertions are false. Indeed, his evidence is relevant to Mr. Clark's primary purpose in making his statement against Mr. Payne. Reasonable jurors could conclude that Mr. Clark made his statement with "reckless indifference to its effect on [Mr. Payne's] reputation", *id.,* in an effort to prevent Mr. Payne from working as a DCRA elevator inspector or to hinder his ability to work elsewhere as an elevator inspector, *Moss,* 580 A.2d at 1028 (trial court properly rejected motion for directed verdict on the basis of a qualified privilege where reasonable jurors could conclude that defendant Athletic Director's statement to university authorities alleging misappropriation of funds was made with malice where evidence suggested Athletic Director may have known of "the inaccuracy of this characterization"); *see also Carter,* 821 A.2d at 894 (directed verdict was improper on the basis of a qualified privilege where reasonable jurors could conclude that defendant store operator intentionally and recklessly lied in connection with his statement to police). The June 21, 2007 email requesting Mr. Clark's participation explained that Mr. Payne "is not at DCRA[,] but there are some remaining steps they need to take to make sure he never returns."

The email implies that Mr. Payne no longer works for DCRA, but also suggests that there is a possibility that he could return to the agency. An issue of material fact remains in dispute as to whether, even assuming Mr. Clark believed Mr. Payne had been terminated,[13] Mr. Clark's statement was primarily motivated by a desire to prevent Mr. Payne from returning to the agency or working elsewhere as an elevator inspector. Given the factual issues remaining as to the primary purpose for Mr. Clark's statement, and the exhibits presented by both parties, we are constrained to conclude that summary judgment was improper on this record. *See Oparaugo, supra,* 884 A.2d at 82.

Accordingly, we vacate the trial court's judgment and remand this case for further proceedings.[14]

*So ordered.*

---

**13.** Mr. Clark stated in a sworn affidavit in August 2009 that "[a]t the time [he] provided information to DCRA, [he] believed that Audrick Payne was no longer employed by DCRA."

**14.** The trial court will have to consider defendants/appellees' motion to strike plaintiff's exhibits, plaintiff's motion to extend discovery, the summary judgment motion as to Mr. Payne's claim for intentional interference with contractual relations, including whether that claim is time-barred, and whether it is preempted by the National Labor Relations Act. Depending upon its rulings as to these matters, the trial court may need to schedule a trial, at least on the defamation claim.