# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 1, 2022        Decided May 23, 2023

No. 22-7004

TERRI D. WRIGHT,
APPELLANT

v.

EUGENE & AGNES E. MEYER FOUNDATION AND NICOLA O.
GOREN,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-02471)

———

*Derek S. Sells* argued the cause and filed the briefs for appellant.

*Alison N. Davis* argued the cause for appellees. With her on the brief was *Anna M. Sheridan*.

Before: MILLETT, WILKINS and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

Dissenting opinion filed by *Circuit Judge* WALKER.

WILKINS, *Circuit Judge*: Plaintiff Dr. Terri Wright is the former Vice President of Program and Community of the Eugene and Agnes E. Meyer Foundation, a non-profit that promotes social and racial equity in the Washington D.C. area. In that role, Wright was responsible for the Foundation's community engagement efforts, grant-making, and collective action strategy. She received largely positive feedback during her tenure, but less than two years after she was hired, the CEO of the Foundation, Nicola Goren, fired her for purported interpersonal and communication-related issues. Wright, who is African-American, believes these stated reasons were pretext to mask discriminatory animus. Seeking to avoid litigation, Wright and the Foundation signed a severance agreement, under which Wright agreed to release employment-related claims against the Foundation and its employees, and which contained a mutual non-disparagement clause. But roughly a month after Wright was fired, Goren told another leader in the non-profit space that Wright was let go because she was "toxic," created a "negative environment," and that two-thirds of the Foundation staff would have quit if Wright had stayed.

Wright sued the Foundation and Goren for breaching the severance agreement, for doing so in a racially discriminatory manner in violation of 42 U.S.C. § 1981, and for defaming her. The District Court dismissed all three claims. It first found that the non-disparagement clause obligated the Foundation only to *direct* its employees not to disparage Wright, leaving the Foundation and its officers and employees free to in fact disparage her. Second, and as a result, the District Court found that Wright's § 1981 claim failed because it was based on a breach of the severance agreement. Lastly, the District Court found that Goren's statements were protected by the common interest privilege, as they were made in her capacity as the Chair of the Board of a separate non-profit organization to the CEO of that organization.

We hold that the District Court erred in dismissing all three claims. As to Wright's breach of contract claim, the non-disparagement clause could reasonably be interpreted to preclude the Foundation from disparaging Wright, and dismissal under Federal Rule of Civil Procedure 12(b)(6) is therefore inappropriate. As to her § 1981 claim, we find that she has plausibly alleged a *prima facie* case that the Foundation, through Goren, breached the severance agreement due to racial animus. And lastly, because Wright has plausibly alleged that Goren's statements were made with reckless disregard for the truth and for discriminatory reasons, they are not protected by the common interest privilege, which requires a showing of good faith on the part of the speaker.

**I.**

The following facts are taken from Wright's complaint and materials incorporated by reference. At the motion-to-dismiss stage, we accept as true the complaint's non-conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Eugene and Agnes E. Meyer Foundation is a grant-making philanthropic organization that operates in the broader Washington D.C. area. Among other causes, the Foundation funds projects aimed at addressing issues of racial inequity. At all relevant times during this dispute, Nicola Goren was the President and CEO of the Foundation.

Dr. Terri Wright has held a variety of leadership positions in the public, private, and non-profit sectors, working on issues of racial and social equity. In February 2018, Goren hired Wright as the Vice President of Program and Community at the Foundation. In that role, Wright oversaw the Foundation's "programs and community engagement efforts," including its strategy for "grant making, capacity building, collective action and advocacy." J.A. 81 (Compl. ¶ 17). During her first year at

the Foundation, Wright "excelled," "spearheaded significant initiatives," and, at the end of 2018, "received a favorable performance evaluation from . . . Goren," as well as a raise. J.A. 82–83 (Compl. ¶¶ 21, 23–24).

At the same time, Goren criticized Wright for her "interpersonal skills and communication issues," feedback she had not received from anyone else at the organization. J.A. 84 (Compl. ¶ 25). Wright alleges that this criticism "was a mere pretext to mask [Goren's] discriminatory animus." J.A. 84 (Compl. ¶ 26). Nevertheless, Wright worked to improve in these areas, and during a mid-2019 check-in, Goren remarked that "Terri has been working on her communication and relationship with her team and . . . things feel less charged than at the end of last year." J.A. 84–85 (Compl. ¶ 28). During the June 2019 Board meeting, Wright's presentation to the Board "received great praise." J.A. 85 (Compl. ¶ 29).

Beyond the particulars of her own employment, Wright's complaint describes a general culture of racial inequity at the Foundation. In 2017, during a round of internal company discussions about racial equity within the workplace, "several employees of color shared their own concerns and experiences regarding race issues within the . . . Foundation." J.A. 75 (Compl. at 2). Subsequently, many employees "felt that their concerns went disregarded," a "sentiment . . . further reflected in the internal surveys staff were requested to complete in 2018." *Id.*

On October 1, 2019, "[w]ithout any notice, warnings or an opportunity to have any discussions regarding her termination," Goren terminated Wright. J.A. 85 (Compl. ¶ 31), 206 (Severance Agreement). Wright alleges that Goren's professed concerns about her interpersonal and communication skills were "pre-textual." *Id*. at 85 (Compl. ¶ 31). But "seeking

to avoid litigation over potential claims . . . regarding the termination," Wright and the Foundation entered into a severance agreement (the "Severance Agreement" or "Agreement"), which lies at the heart of the current dispute. J.A. 86 (Compl. ¶ 33). That Agreement contained the following clause:

> **Mutual Non-Disparagement.** You agree that you have not made, and will not make, any false, disparaging or derogatory statements to any person or entity, including any media outlet, industry group or financial institution, regarding the Foundation or any of the other Releasees, or about the Foundation's business affairs and/or financial conditions; <u>provided, however</u>, that nothing herein prevents you from making truthful disclosures to any governmental entity or in any litigation or arbitration. Likewise, the Foundation will direct those officers, directors, and employees with direct knowledge of this revised letter agreement not to make any false, disparaging or derogatory statements to any person or entity regarding you; <u>provided, however</u>, that nothing herein prevents such individuals from making truthful disclosures to any governmental entity in litigation or arbitration.

J.A. 208 (emphases in original). The Agreement was signed by Wright and Goren and constituted "a binding agreement with the Foundation." J.A. 206, 28–29. The Agreement also contained a broad "Release of Claims" clause, under which Wright agreed to forfeit "any and all claims arising out of or relating to [her] employment with and/or separation from the Foundation . . . ." J.A. 26.

6

In November 2019, roughly a month after Wright's termination, Goren was at an offsite meeting in her capacity as the Chair of the Board of the Washington Regional Association of Grantmakers ("WRAG"). There, she met with Dr. Madye Henson, who was at the time President and CEO of WRAG. During that meeting, "Goren complained that she was feeling backlash from abruptly terminating Dr. Wright," and in response, "Henson shared that many leaders in the community [were] questioning her decision and believe[d] that" the decision was "discriminatorily motivated." J.A. 86–87 (Compl. ¶ 36). "Goren acknowledged that she sensed this was the perception but claimed that she had no option" because Wright was "toxic," fostered a "negative climate" at the Foundation, and "had to be fired or two-thirds of the staff would leave." J.A. 87 (Compl. ¶ 37). Since that time, Henson has sued WRAG, Goren, and others for racial discrimination and retaliation.

Based on Goren's statements to Henson, Wright brings three claims in this lawsuit: first, that Goren and the Foundation discriminated against her on the basis of race in violation of 42 U.S.C. § 1981; second, that Goren defamed her; and third, that Goren and the Foundation breached the non-disparagement clause of the Severance Agreement.

The District Court dismissed the complaint for failure to state a claim. Wright timely appealed the dismissal of all three claims.

**II.**

This Court reviews a district court's decision granting a motion to dismiss for failure to state a claim *de novo*. *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1240 (D.C. Cir. 2018). To survive a Rule 12(b)(6) challenge, "a complaint must contain sufficient factual matter, accepted as true, to 'state

a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In conducting our analysis, we "must treat the complaint's factual allegations as true, and must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *W. Org. of Res. Councils*, 892 F.3d at 1240–41 (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)). We also may consider "any documents either attached to or incorporated in the complaint," such as the Severance Agreement here. *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020).

## A.

We begin with Wright's breach of contract claim.

By its terms, the Severance Agreement is governed by D.C. law, and neither party argues otherwise. Accordingly, we must "first . . . determine what a reasonable person in the position of the parties would have thought the disputed language meant." *Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C. 2009). In doing so, "a reasonable person is: (1) presumed to know all the circumstances surrounding the contract's making; and (2) bound by usages of the terms which either party knows or has reason to know." *Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 299 (D.C. 2006). The "reasonable person standard is applied both to the circumstances surrounding the contract and the course of conduct of the parties under the contract." *Id.* And while extrinsic evidence "may not be relied upon to show the subjective intent of the parties absent ambiguity in the contract's language," it "may be considered to determine the circumstances surrounding the making of the contract, so that it may be ascertained what a reasonable person in the position of the parties would have thought the words meant." *Nest &*

*Totah Venture, LLC v. Deutsch*, 31 A.3d 1211, 1227 (D.C. 2011).

Where a contract is unambiguous, the court's task is to determine "the best objective manifestation of the parties' intent." *Debnam*, 976 A.2d at 197. But where "a contract is reasonably or fairly susceptible to different constructions or interpretations, . . . the provisions of the contract are ambiguous, [and] the correct interpretation becomes a question for a factfinder." *Id.* at 197–98; *see also id.* at 200 (reversing grant of summary judgment where a contract provision "could reasonably be read as having more than one reasonable interpretation").

Here, the parties dispute the meaning of the Severance Agreement's non-disparagement clause. The crux of Wright's claim is that implicit in the Foundation's promise to "direct" certain officers, directors, and employees to not disparage her was a promise that the Foundation itself would also not disparage her, at least through the statements of its CEO and President who signed the Agreement. Thus, Wright argues, the Foundation breached the Severance Agreement when Goren disparaged her in her conversation with Dr. Henson. In Defendants' view, the Foundation's duty began and ended with its promise to "direct" its employees; neither the Foundation, nor its directors or any other employee, had a corresponding or continuing duty to not disparage Wright.

We find that the Severance Agreement, read as a whole, is ambiguous and reasonably capable of Wright's interpretation. We start with the plain language of the contract, which contains three textual clues suggesting some symmetry between the parties' obligations to one another. First, the relevant clause in the Severance Agreement is titled "Mutual Non-Disparagement." J.A. 208 (emphasis added). Second, the

contract language connects the parties' duties with the term "Likewise": "You [(Dr. Wright)] agree that you have not made, and will not make, any false, disparaging or derogatory statements. . . . Likewise, the Foundation will direct . . . ." *Id.* (emphasis added). Wright, for her part, is obligated under the non-disparagement clause to not make disparaging statements about the Foundation or certain employees. Third, the "provided, however" clause directly contradicts the Foundation's assertion that its officers, directors, and employees had no duty not to disparage Wright. That provision grants the Foundation's personnel the limited ability to disparage Wright as part of litigation or arbitration proceedings. J.A. 208 ("provided, however, that nothing herein prevents such individuals from making truthful disclosures to any governmental entity in litigation or arbitration[]"). But if the contract's sole obligation on the Foundation and its personnel was for an anti-disparagement directive to issue—and no one's negative speech about Wright was contractually curtailed—then this carve out is pointless and serves no purpose. Courts, however, cannot read one part of a contractual clause to render the next sentence a nullity. *See Abdelrhman v. Ackerman*, 76 A.3d 883, 891 (D.C. 2013) ("When interpreting a contract, we 'strive to give reasonable effect to all its parts and eschew an interpretation that would render part of it meaningless or incompatible with the contract as a whole.'") (quoting *District of Columbia v. Young*, 39 A.3d 36, 40 (D.C. 2012)); *Cap. City Mortg. Corp. v. Habana Vill. Art & Folklore, Inc.*, 747 A.2d 564, 569 (D.C. 2000) ("The court construing a contract cannot ignore a contract term; each provision must be given meaning if at all possible.").

Reading the contract as a whole, a reasonable person in the position of the parties could very well understand the terms "Mutual" and "Likewise," and the "provided, however" clause, to mean that the Foundation has some corresponding duty to

not disparage Wright, even if that duty extends only to the actions of certain individuals who exert significant control over, or speak on behalf of, the Foundation such as the Board or the CEO. *Cf. Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 578 (D.C. Cir. 2013) (holding that a reasonable jury could find employer vicariously liable for discriminatory statements made by an employee's supervisors).[1]

Certain allegations related to the parties' negotiations also suggest that this interpretation is reasonable. Because of Goren's previous criticism of Wright's interpersonal skills, which are detailed in the complaint, the non-disparagement clause was "[c]ritically important" to Wright. J.A. 86 (Compl. ¶ 33). With that background, it would make little sense if the mutual non-disparagement clause permitted the Foundation, acting through the very person who signed the contract, who fired Wright assertedly based on criticisms of her professional skills, and who controlled the Foundation to a significant extent, to freely disparage Wright.

To be sure, Defendants' and our dissenting colleague's more narrow interpretation of the contractual language is not untenable. However, it focuses exclusively on the phrase "will direct," while omitting the words "Mutual," "Likewise,"[2] and

---

[1] We are not concerned that reading the contract this way would limitlessly "police the on-duty and off-duty speech" of the Foundation's employees, including "discussions at the dinner table." *See* Dissenting Op. at 3–4. The alleged conduct here lay not at the outermost boundaries of what the Foundation plausibly promised but was instead much closer to its core.

[2] Our dissenting colleague proffers an alternate explanation for the presence of the terms "mutual" and "likewise" (though not the "provided, however" clause). Dissenting Op. at 4–5. But that does not dispute the plausibility of our plain-text reading of the contract, read as a whole. To be clear, we maintain only that the contract is

"provided, however," from its analysis of the contract's meaning. Contracts must be "construed in harmony with the plain and generally accepted meaning of the words used, with reference to all of the agreement's provisions." 11 WILLISTON ON CONTRACTS § 30:5 (4th ed. May 2022 update); *Steele Founds., Inc. v. Clark Constr. Grp., Inc.*, 937 A.2d 148, 154 (D.C. 2007) ("Contractual provisions are interpreted taking into account the contract as a whole, so as to give effect, if possible, to all of the provisions in the contract."); *Davis v. Chevy Chase Fin., Ltd.*, 667 F.2d 160, 170 (D.C. Cir. 1981) (applying the contract law "credo[]" that "every word in an agreement should be given meaning"); *Guardsmark, LLC v. NLRB*, 475 F.3d 369, 378 (D.C. Cir. 2007) (statutory interpretation case citing *Davis* for the same proposition).

Beyond the contractual language, a simple hypothetical further reveals why we cannot conclude, as a matter of law, that Defendants' interpretation of the non-disparagement clause is the only reasonable one. Imagine if, after signing the Agreement, a director at the Foundation sent an email to all of its employees as well as its Board directing them not to make false, disparaging, or derogatory statements about Dr. Wright. Then, only minutes later, the Board and the CEO go on to release a public statement disparaging Dr. Wright. Under Defendants' theory, the Foundation would have upheld its end of the bargain under the express terms of the contract (as counsel represented at argument). Oral Arg. Tr. at 12:21–13:18. In our view, however, a factfinder could find such a reading unreasonable. And while counsel for Defendants did clarify that under such circumstances, Wright may have a separate claim under a distinct, fraud-based theory, that concession does not persuade us that the only reasonable

---

reasonably capable of Wright's interpretation at this juncture; we do not purport to definitively resolve its meaning.

reading of the Severance Agreement places such a claim beyond the scope of a straightforward contractual breach. *Id.* at 20:18–21:8.

As a final matter, the complaint does not specify whether Wright seeks to pursue a breach of contract claim against the Foundation only, or against Goren as well. To the extent she seeks the latter, we find that Goren cannot be held personally liable for breach of contract, because she was not a party to the contract and therefore was not bound by it. *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002); *accord* 12 WILLISTON ON CONTRACTS § 35:66 (4th ed. May 2022 update) ("[I]t is fundamental that an officer of a corporation is not individually bound when contracting as an agent of the corporation within the scope of employment, at least when the corporate principal is disclosed and when the contract does not on its face disclose an intention by the agent to be personally bound."). Accordingly, the breach of contract claim survives only as to the Foundation, and any claim against Goren is dismissed.

Whether or not Wright will ultimately be able to prove that her interpretation is the best reading of the contract remains to be seen. However, we conclude that a reasonable person could find the Severance Agreement susceptible to either of the meanings offered by the parties, and dismissal at this early juncture is therefore unwarranted. Wright has plausibly alleged that the Foundation breached its duty to her when its then-CEO and President disparaged her a month after signing the Severance Agreement on its behalf.

**B.**

Having found that Wright has successfully stated a claim for breach of contract, we turn to her § 1981 claim.

13

"Section 1981 protects the right 'to make and enforce contracts' free from racial discrimination." *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017) (quoting 42 U.S.C. § 1981(a)). "To prevail, a plaintiff must initially plead . . . that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

"[T]he pleading standards under section 1981 track those in the familiar *McDonnell Douglas* rubric for alleging a *prima facie* case of purposeful employment discrimination." *Nanko Shipping*, 850 F.3d at 467. To plead a *prima facie* case under that framework, "a plaintiff without direct evidence of discrimination as it relates to contractual rights must first . . . establish[] that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination." *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (internal quotation marks and citation omitted). "The plaintiff's initial burden is not onerous." *Nanko Shipping*, 850 F.3d at 467 (internal quotation marks and citation omitted).

Wright has alleged the "basic elements of a *prima facie* case of intentional discrimination" sufficient to raise her "right to relief above the speculative level." *Id.* Most concretely, she has alleged that the Foundation did not defame her predecessor, a white man who also separated from the company, nor any other non-African-American employee. Under this Court's precedent, that is sufficient to survive a motion to dismiss. *See id.* (finding it sufficient that "Nanko allege[d] that Alcoa, aware of Diané's race, treated the company he owns and operates less favorably than similarly situated white-owned companies"); *Brown*, 774 F.3d at 1023 (finding it sufficient for a plaintiff to identify a "similarly-situated employee who is not in her

protected class"). In fact, while such "[a]llegations regarding comparators, racial comments, [or] pretext obviously strengthen [Wright's] discrimination complaint," they are not even required at the pleading stage. *Nanko Shipping*, 850 F.3d at 467.[3]

Two other sets of allegations push Wright's § 1981 claim farther over the plausibility threshold. The first are those related to Goren's praise of Wright's performance, followed by Wright's termination. Goren noted that Wright had a "strong year" and "contributed to the advancement of [the Foundation's] mission, vision and goals." J.A. 83 (Compl. ¶ 25). More specifically, Goren remarked that Wright "[d]eveloped and presented a cohesive request and plan for respectfully transitioning organizations that do not fit in the new strategy, which resulted in the Board unanimously approving efforts to increase the grant target over two years and accommodate the transition." J.A. 83–84 (Compl. ¶ 25). And even more to the point, just a few months before the termination, Goren commented that Wright "had been working on her communication and relationship with her team" successfully such that she remarked, "things feel less charged than at the end of last year." J.A. 84–85 (Compl. ¶ 28). In

---

[3] Our dissenting colleague suggests that Wright's § 1981 claim "need[s] [a] comparison" between herself and "an employee of a different race" and fails solely because she did not provide one. Dissenting Op. at 6. That is incompatible with *Nanko Shipping*, 850 F.3d at 467, in which we explicitly stated that a comparator is not needed at the pleading stage. In addition, the dissent's requirement that Wright identify a comparator who had a non-disparagement clause does not make sense on our facts. The complaint alleges that the Foundation was willing to breach a contractual duty to defame her, an African-American individual, while it did not defame her white predecessor, even though doing so would not have breached a contract. Those facts are more probative of discrimination, not less.

accord with this overall picture of Wright's competence and success in her new role at the Foundation, she also received a salary raise during her first year. J.A. 83 (Compl. ¶ 24). At the same time, and in contrast to this praise, which was specific and detailed, Goren's criticisms of Wright were vague and subjective; when Wright asked for clarification, she was simply told she was "too busy in the weeds." J.A. 84 (Compl. ¶ 26). Then, Goren fired Wright without notice or warning, inconsistent with her performance record.

The second set of relevant allegations are those pertaining to the general culture of racial inequity at the Foundation which, according to the complaint, "negatively impacted" the working experience of employees of color. J.A. 81 (Compl. ¶ 19). At one point, Wright was asked to "manage [an] African-American Program Assistant" who did "not feel comfortable" working at the Foundation and subsequently left, due to how she was treated on account of her race. J.A. 82 (Compl. ¶ 20).

Construing these facts in Wright's favor—the combination of specific and factually detailed praise, vague and subjective critiques that conflicted with that praise, and an unexpected termination, in addition to the work environment at the Foundation—Wright has plausibly alleged that Goren was motivated by racial animus in her description of Wright to Henson as "toxic" and having created a "negative climate" at work. Of course, Dr. Wright's "burden at the summary judgment stage and at trial [will be] different and substantially more onerous than the pleading burden," *Nanko Shipping*, 850 F.3d at 467, but we find that she has met the lower pleading burden here, and her § 1981 claim against the Foundation survives. And because we conclude that Wright has stated a § 1981 claim based on an alleged breach of the Severance Agreement, we decline to address her alternative theory under the "make benefits" clause.

Lastly, we find that Wright cannot maintain a § 1981 claim against Goren individually because, once again, Wright and Goren did not have a contractual relationship. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) ("Any claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship' . . . under which the plaintiff has rights.").

**C.**

Finally, we turn to Wright's defamation claim, which Wright brings against Goren only.

Under D.C. law, a plaintiff pleading defamation must allege: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001); *accord Farah v. Esquire Mag.*, 736 F.3d 528, 533–34 (D.C. Cir. 2013).

In their motion to dismiss, Defendants argued that the defamation claim failed for two reasons: first, that Goren's statements were protected by the common interest privilege because Goren and Henson were leaders of the same non-profit organization at the time the statements were made, and second, that the statements were opinions and therefore not capable of defamatory meaning. The District Court agreed that the common interest privilege applied and did not decide the second issue. Once again, we reverse.

17

**1.**

"The common interest privilege protects otherwise defamatory statements made '(1) . . . in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest.'" *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006) (quoting *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990)). As a "qualified privilege," it "exists only if the publisher believes, with reasonable grounds, that [the] statement is true." *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 290 (D.C. 1977); *see also Roland v. d'Arazien*, 685 F.2d 653, 655 (D.C. Cir. 1982); *Ford Motor Credit Co. v. Holland*, 367 A.2d 1311 (D.C. 1977); RESTATEMENT (SECOND) OF TORTS § 596 (1977) (statements made to further a common interest are "conditionally privileged"). In other words, for the privilege to apply, publication must not only be "reasonably calculated to protect or further the interest," but also it cannot be made with "malice," which, "within the context of the common interest privilege, is 'the equivalent of bad faith.'" *Mastro*, 447 F.3d at 858 (quoting *Moss*, 580 A.2d at 1024–25). Thus, while a defendant is "presumed" to act with "pure motives" in making a conditionally privileged statement, a plaintiff may "rebut this presumption" through a showing of malice. *Ford Credit Co.*, 367 A.2d at 190.

Even assuming that the pleadings establish a common interest between Goren and Henson, we find the privilege inapplicable because the complaint plausibly establishes that the statements were made with malice. In short, Goren did not have "reasonable grounds" to believe her statements were true for many of the reasons already discussed. Wright had received a favorable performance evaluation and a raise.

Goren had also praised her for a "strong year" and even acknowledged that she had been "working on her communication." Accepting these allegations as true and drawing inferences in Wright's favor, we cannot conclude, as a matter of law, that Goren's statements criticizing Wright were made in good faith. The allegations that Goren's statements were motivated at least in part by racial animus weigh further against such a finding at the 12(b)(6) stage. *Cf. Mastro*, 447 F.3d at 859 (a "conscious indifference or reckless disregard" for the "rights or feelings of others" constitutes malice).

The dissent points out that the privilege applies if "the primary purpose" is to further the common interest. Dissenting Op. at 9. True, and we do not suggest that a showing that Goren bore "ill will" or "resentment" towards Wright would *per se* defeat the privilege. *See, e.g.*, *Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C. 1983). But the fact remains that Goren must have reasonably believed her statements to be true for the privilege to apply. That is "ordinarily a factual issue for the jury" which we should not prejudge. *Payne v. Clark*, 25 A.3d 918, 926 (D.C. 2011) (quoting *Oparaugo v. Watts*, 884 A.2d 63, 82 (D.C. 2005)).

In any event, there are also reasons to doubt that the purpose of the statements was to further the privilege. Had Goren been explaining Wright's termination to Henson in response to a specific question, or had she offered a more formal description of the relevant events, she might have a stronger case. But that is not what happened here. Rather, according to the complaint, Goren raised the issue of Wright's termination unprompted, first telling Henson that she was "feeling backlash" over the firing, and then—in response to an acknowledgement of that backlash from Henson—she made

the disparaging statements.[4]  Moreover, rather than explaining the firing in a neutral manner, Goren used language that could fairly be characterized as *ad hominem* and unprofessional in describing Wright, such as calling her "toxic" and claiming that two-thirds of the staff would quit if Wright remained.  *Cf. Mastro*, 447 F.3d at 849 (privilege applied where employer published official termination memorandum to human resources).

**2.**

The last remaining issue is whether Goren's statements were defamatory.  "A statement is 'defamatory' if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Moss*, 580 A.2d at 1023.  At the same time, "a statement of opinion is actionable only if it has an explicit or implicit factual foundation and is therefore objectively verifiable." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 589 (D.C. 2000); *accord* RESTATEMENT (SECOND) OF TORTS § 566 (Oct. 2022 update) ("A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.").

---

[4] Our dissenting colleague argues that "Goren did not say anything negative about Wright until Henson worried that Wright's firing had been racially motivated."  Dissenting Op. at 9.  But construing the complaint in the light most favorable to Wright, we can plausibly infer that the "backlash" that Goren raised, unprompted, was precisely the backlash that Goren and Henson ultimately discussed—that the firing was purportedly discriminatorily motivated.  Thus, we cannot conclude that the "primary purpose" of the communication was to further any common interest.

We find that at least two of the three statements made by Goren have an implicit factual basis and are therefore actionable. The claim that Wright fostered a negative climate at work could easily imply that Goren had personal knowledge of specific actions or behaviors of Wright's leading to that conclusion. This could in turn be verified or shown through indicia such as complaints, high turnover, or testimony from colleagues. And such a statement would naturally "tend[] to injure" Wright in her "trade, profession or community standing," especially given the fact that they were made to another leader in the non-profit space. *Moss*, 580 A.2d at 1023. The claim that two-thirds of the staff would leave if Wright stayed is a straightforward assertion of fact.

Goren does not otherwise challenge Wright's defamation claim. Thus, based on the lack of a qualifying privilege, and because at least two of the alleged statements are actionable, the defamation claim survives.

* * *

For these reasons, Wright's breach of contract and § 1981 claims against the Foundation are reinstated, as is her defamation claim against Goren. We reverse and remand for further proceedings.

*It is so ordered.*

WALKER, *Circuit Judge*, dissenting:

The Eugene & Agnes E. Meyer Foundation fired Terri Wright. She alleges that the Foundation later defamed her, breached their severance agreement, and deprived her of contractual rights because she is African-American. Because those allegations are not plausible, I would affirm the district court's decision to dismiss the suit.

I

Four years ago, the Eugene & Agnes E. Meyer Foundation fired Terri Wright, its Vice President of Program and Community. The parties later signed a severance agreement. It included the following "Mutual Non-Disparagement" provision:

> You [Wright] agree that you have not made, and will not make, any false, disparaging or derogatory statements . . . regarding the Foundation . . . . Likewise, the Foundation will direct those officers, directors and employees with direct knowledge of this revised letter agreement not to make any false, disparaging or derogatory statements to any person or entity regarding you . . . .

JA 208.

A month after Wright's firing, the Foundation's President and CEO, Nicola Goren, met with Madye Henson in their capacities as colleagues within a different nonprofit organization — the Washington Regional Association of Grantmakers. Goren was the Association's Board Chair. Henson was its President and CEO.

At the meeting, Goren complained that she was feeling backlash following Wright's termination. In response, Henson

said the nonprofit community was concerned that Wright's firing was racially motivated. Goren disputed those claims. She told Henson that Wright had been fired because she was "'toxic,'" "fostered" a "'negative climate'" at the Foundation, and "two-thirds of the staff would [have] le[ft]" if she had remained. JA 87.

After Wright learned of Goren's comments, Wright sued. First, she alleged that the Foundation and Goren breached the mutual non-disparagement clause in the severance agreement. Second, she claimed that the breach was racially motivated, and thus violated the law's guarantee that "[a]ll persons . . . have the same right . . . to make and enforce contracts." 42 U.S.C. § 1981(a). Third, she sued Goren individually for defamation.

The district court held that Wright failed to state a plausible claim to relief, and it dismissed the case. *See* Fed. R. Civ. P. 12(b)(6).

I would affirm.

## II

We review the district court's decision to dismiss de novo. *Carter v. Washington Metropolitan Area Transit Authority*, 503 F.3d 143, 145 (D.C. Cir. 2007). "To survive a motion to dismiss," Wright's "complaint must contain" enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). At this stage, we take Wright's factual allegations as true and draw reasonable inferences in her favor. *Id.* at 678.

Applying that standard, Wright fails to state a claim.

3

A

Wright's breach-of-contract claim against the Foundation must, among other things, point to "an obligation or duty arising out of the contract" and identify "a breach of that duty." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). Here, Wright has not done that.[1]

Start with the text. The Foundation promised to "*direct* [its] officers, directors and employees with direct knowledge of this . . . agreement not to make any false, disparaging or derogatory statements." JA 208 (emphasis added). That is a promise by the Foundation to *order* some of its employees not to disparage Wright. It is not a guarantee that those employees would *follow* the Foundation's order.

Thus, to state a claim for breach, Wright must allege that the Foundation failed to tell Goren not to make disparaging comments. But Wright does not allege that. Instead, she claims that the Foundation and Goren breached the agreement when Goren *made* disparaging remarks.

That turns the Foundation's promise into something it's not: a guarantee that Foundation employees would not disparage Wright. That guarantee would have required the Foundation to police the on-duty and off-duty speech of those employees mentioned by the agreement, including their texts and

---

[1] I agree with the Court that Wright cannot sue Goren individually for breach of the severance agreement. Goren "was not a party to the contract" so "was not bound by it." Majority Op. 12.

social-media posts, their conversations on the phone, and even their discussions at the dinner table.

Of course, Wright could have bargained for that type of guarantee by including it in the contract's terms.  In fact, the Foundation did.  Wright promised that she would "not ma[ke], any false, disparaging or derogatory statements . . . regarding the Foundation."  JA 208.

Because of the stark textual contrast between Wright's promise and the Foundation's, we should not read both to mean the same thing.  That would ignore the difference between the parties' promises and thus fail to give "effective meaning to all [the contract's] terms."  *1010 Potomac Associates v. Grocery Manufacturers of America, Inc.*, 485 A.2d 199, 205 (D.C. 1984).

True, the word "[l]ikewise" links the sentences containing the parties' promises, and the clause is titled "*Mutual* Non-Disparagement."  JA 208 (emphasis added).  But "likewise" often does not mean "identically."  Particularly when what precedes "likewise" differs from what follows it — as it does here — "likewise" means "similarly" or "in addition."  *See* likewise (def. 1 & 2), *Merriam-Webster* (2023).  That is how Wright herself uses the word in briefing to the district court.  *See* JA 114 ("Plaintiff alleged that her predecessor, a Caucasian male . . . was not disparaged by Defendant Goren . . . .  Plaintiff *likewise* alleged that no non-African American employee that was given a severance agreement . . . was subsequently disparaged.") (emphasis added).

As for "mutual" promises, they need not be mirror images.  In contract law, they are promises that are offered in return for one another — often for different things.  *3511 13th Street Tenants' Association v. 3511 13th Street, N.W.*

*Residences, LLC*, 922 A.2d 439, 443 (D.C. 2007). Here, the word "mutual" merely tells us that the parties' non-disparagement promises were in exchange for one another.

In response, Wright says that contracts "should not be interpreted to render the contract promise illusory or meaningless." *Retail Clerks International Association v. NLRB*, 510 F.2d 802, 806 n.15 (D.C. Cir. 1975). But where, as here, the text is clear, that rule does not come "into play." *Id.* If the text of a contract is unambiguous, "we enforce" it "according to [its] terms." *Dyer v. Bilaal*, 983 A.2d 349, 361 (D.C. 2009).

Plus, a promise to direct a group of employees is not illusory or meaningless. It requires the Foundation to act, even if there's still a chance the employees will defy the Foundation's directive. And if the Foundation does act — by directing its employees not to disparage Wright — its action increases the chances that the employees will refrain from disparaging Wright. That increased likelihood is far from worthless.

B

Wright also claims that the Foundation's breach of the non-disparagement clause was racially motivated, so it violated her right "to make and enforce contracts" regardless of race. 42 U.S.C. § 1981(a). But that argument falls at the first hurdle: The Foundation did not breach the non-disparagement clause. So Wright did not suffer "the loss of a legally protected right." *Comcast Corp. v. National Association of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

Even if Wright *had* plausibly pleaded breach of contract, she would still need to allege that the breach was racially motivated. That means she must plausibly allege that the Foundation was "aware" of her race and that she was treated differently

from "similarly situated" people who were not part of her racial group. *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017). Her complaint does not do that.

Wright says that her predecessor, "a Caucasian male," was not disparaged after his employment. JA 80. But she does not allege he had a contract that made him similarly situated to her in a way that matters for a § 1981 claim. We do not know if he was party to a non-disparagement clause with the Foundation. Only if we did could we compare his treatment to hers. And absent that, we have no way of knowing how the Foundation would have treated a non-disparagement clause with an employee of a different race.

We need that kind of comparison because § 1981 addresses "discrimination as it relates to contractual rights," *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014), a principle confirmed by the cases that Wright and today's Court cite. *See* Appellant Br. 19, 29, 30, 31 (citing *Brown*, 774 F.3d 1016; *Nanko Shipping*, 850 F.3d 461); Majority Op. 12-15 (same). When those cases discuss the treatment of "similarly situated" persons as evidence of contractual discrimination at the pleading stage, they identify people who are similarly situated *with regard to their contractual rights*. In *Brown v. Sessoms*, for example, the plaintiff pointed to another person with similar credentials who was offered the same kind of contract that she sought. 774 F.3d at 1019. Similarly, in *Nanko Shipping v. Alcoa*, the plaintiff company pointed to similar companies that were offered the same kind of contracts that the plaintiff sought. 850 F.3d at 467. In each case, a similarly situated party was given a contractual right that the plaintiff was denied. *See also Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479 (2006) ("[N]othing in the text of § 1981 suggests that it was meant to provide an omnibus remedy for *all* racial injustice. If

so, it would not have been limited to situations involving contracts.").

C

Wright's defamation claim fares no better. To succeed, she must plead, among other things, that Goren "published [a defamatory] statement *without privilege* to a third party." *Payne v. Clark*, 25 A.3d 918, 924 (D.C. 2011). But here, the common-interest privilege protects the alleged speech.

That privilege applies to speech "made in good faith" about a subject of "common interest" to both the speaker and the listener. *Id.* at 925 (cleaned up). The existence of a common interest depends on the "apparent[]" motive of a conversation instead of secret intentions. *Id.* (cleaned up).[2] The privilege can cover private discussions about the reasons for a firing.[3] For example, the D.C. Court of Appeals applied the

_____

[2] Precedents from the D.C. Court of Appeals make clear that finding a common interest depends on the objective manifestations of the parties, and not their subjective intent. The applicability of the privilege depends upon "'the primary motive by which the defendant is *apparently* inspired.'" *Payne*, 25 A.3d at 925 (quoting *Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C. 1983)) (emphasis added). And the court has clarified that the question whether a statement was made to further the common interest (as opposed to being made in bad faith) depends not on secret intentions, but rather "the language of the communication and the circumstances attending its publication by the defendant." *Mosrie*, 467 A.2d at 478 (cleaned up); *Heard v. Johnson*, 810 A.2d 871, 886 n.6 (D.C. 2002).

[3] In fact, the privilege can cover a wide range of common interests, even interests that are general in nature. For example, the privilege covered a statement made by a bank security officer to a law enforcement officer, presumably because both parties had a general interest

privilege to a discussion among "church members about matters of mutual concern . . . such as reasons for dismissal of the pastor." *Heard v. Johnson*, 810 A.2d 871, 886 n.6 (D.C. 2002).

Here, Goren and Henson had a "common interest." *Payne*, 25 A.3d at 925. They met in their capacities as a board chair (Goren) and CEO (Henson) of the Washington Regional Association of Grantmakers. After Goren complained of the backlash she was experiencing in the wake of Wright's termination, the two discussed rumors that Wright's firing was racially motivated — which, if true, would reflect poorly on the Association because of Goren's leadership role in the Association. Responding to those concerns, Goren assured Henson that Wright was fired not because of her race but for being "'toxic'" and fostering "a 'negative climate'" that resulted in "two-thirds of the staff" wanting to leave. JA 87.

To be sure, because Wright's complaint alleges racial animus, it alleges bad faith. *Payne*, 25 A.3d at 925 (cleaned up) (statements made "with such a conscious indifference" of their "effects upon the rights or feelings of others as to constitute ill will" are made in bad faith). But that does not defeat the privilege if "the primary purpose" of a statement was to further a common interest. *Id.* at 926 (cleaned up). "[T]he fact that the defendant feels resentment and indignation towards the plaintiff and enjoys defaming him will *not* forfeit the privilege so

---

in ensuring that the bank's customers were protected by law. *Columbia First Bank v. Ferguson*, 665 A.2d 650, 655 (D.C. 1995). Unsurprisingly, a common interest has been readily found when two members of an organization discussed the conduct of a member of the same organization. *See Heard*, 810 A.2d at 886 n.6 (church members making statements to each other concerning grievances about the church's pastor); *Mosrie*, 467 A.2d at 476-78 (police officer making statements to the chief of police concerning misconduct of an officer).

long as the primary purpose of the statement is to further the interest which is entitled to protection." *Id.* at 925-26 (cleaned up).

Here, the complaint confirms that a common interest in the Association's reputation was the primary purpose of Goren's remarks about Wright. Indeed, Goren did not say anything negative about Wright until Henson worried that Wright's firing had been racially motivated. JA 87. Commenting on Wright's poor performance at the Foundation reassured Henson that the Association's reputation was safe. *Id.*

\* \* \*

Because Wright fails to state a plausible claim for relief, I respectfully dissent.